**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION**

| | |
|---|---|
| LLOYD and DANIELLE NEAL, JAMES P. TROY, and DAVID M. SABATO and MITZI B. SABATO as trustees of SABATO DAVID M AND SABATO MITZI B 2017 REVOCABLE TRUST,<br><br>       Plaintiffs,<br><br>  vs.<br><br>GREENFIELDS IRRIGATION DISTRICT, FORT SHAW IRRIGATION DISTRICT, UNITED STATES, and DOES A-E,<br><br>       Defendants. | Cause No. CV-21-106-GF-BMM<br><br><br>ORDER |

## INTRODUCTION

Defendant Greenfields Irrigation District ("GID") filed a motion for partial summary judgment that Mont. Code Ann. § 85-7-2212 bars Plaintiff Sabato Trust's ("Sabato") claims. (Doc. 168 at 2.) Plaintiffs oppose the motion. (Doc. 214.) The Court held a hearing on the motion on October 2, 2024. (Doc. 248.)

## BACKGROUND

GID entered a contract with the United States Bureau of Reclamation ("BOR") to perform operation and maintenance duties for the Sun River Project.

(Doc. 34, ¶ 7.) The Sun River Project uses various reservoirs, including the Willow Creek Reservoir, to store and deliver water from the Sun River and its tributaries. (*Id.*, ¶ 2.) The project diverts water from the Sun River Diversion Dam to the Willow Creek Reservoir using the Willow Creek Feeder Canal ("WCFC"). (*Id.*, ¶ 2.) The WCFC runs across land owned by Plaintiffs Lloyd and Danielle Neal ("Neals"), James P. Troy ("Troy"), and David M. Sabato and Mitzi B. Sabato as trustees of the Sabato David M and Sabato Mitzi B 2017 Revocable Trust ("Sabatos") (collectively "Plaintiffs"). (Doc. 111, ¶ 6.)

Plaintiffs have brought this action against GID and the Fort Shaw Irrigation District ("FSID") alleging the following claims: (1) negligence, (2) public nuisance, (3) private nuisance, (4) trespass, (5) strict liability for abnormally dangerous activity, (6) wrongful occupation of real property, and (7) unjust enrichment. (Doc. 5 at 10–18.) Plaintiffs contend that Defendants have failed to reasonably maintain and operate the WCFC. (*Id.*, ¶ 21.) Plaintiffs further contend that Defendants' alleged failures have caused both erosion of Plaintiffs' properties and a build-up of silt and sediment on Plaintiffs' properties. (*Id.*) Plaintiffs seek damages for loss of enjoyment, diminution of value, and restoration of their real property. (*Id.*, ¶ 61.)

## STANDARD OF REVIEW

Summary judgment proves appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as

2

a matter of law." Fed. R. Civ. P. 56(a). Material facts are those which may affect the

outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A

genuine dispute of material fact requires sufficient evidence for a reasonable jury to

return a verdict for the nonmoving party. *Id*. at 248.

## DISCUSSION

### I.    GID's Motion for Partial Summary Judgment Regarding Whether Mont. Code Ann. § 85-7-2212 Bars Sabato's Claims

GID argues Mont. Code Ann. § 85-7-2212 bars Sabato's claims. GID

contends that Sabato's claims partially arise from natural weather events that predate

Sabato's ownership and from seepage from the WCFC. (Doc. 168 at 8–17.) The

Court agrees that the statute bars Sabato's claims.

Mont. Code Ann. § 85-7-2212 provides as follows:

An irrigation district or private person or entity owning or operating irrigation diversions, aqueducts, canals, ditches, drains, flumes, headgates, siphons, or other water conveyance structures or infrastructure is not liable for:

(1) personal injury or property damage resulting from floodwaters caused by rainfall or other weather conditions or acts of nature;
(2) personal injury or property damage occurring on another's land and caused by water seepage that existed or began before the injured person first arrived on or obtained an interest in the land or before the damaged property was first placed on the land, if the seepage does not carry toxic chemicals onto the land…

Sabato argues against application of either § 85-7-2212(1) or (2) to their claims.

A party opposing summary judgment must offer more than self-serving

speculative, conclusory, and unsupported statements. *Opara v. Yellen*, 57 F.4th 709,

728-29 (9th Cir. 2023). The Court acknowledges "that declarations are often self-serving, and this is properly so because the party submitting it would use the declaration to support his or her position." *Nigro v. Sears, Roebuck and Co*, 784 F.3d 495, 497 (9th Cir. 2015) (internal citation omitted). A court "may not disregard a piece of evidence . . . solely based on its self-serving nature" at the summary judgment stage. *Id.* (citing *S.E.C. v. Phan*, 500 F.3d 895, 909 (9th Cir. 2007) (holding that the district court erred in disregarding declarations as "uncorroborated and self-serving").

### A. The Evaluation of Self-Serving Declarations at Summary Judgment

The Court pauses to analyze in some detail the Ninth Circuit's evaluation of self-serving declarations at summary judgment. Not all self-serving declarations create a genuine issue of material fact that precludes summary judgment. *Nigro*, 784 F.3d at 497–98. A court may exclude testimony at the summary judgment stage where a party's declaration lacks personal knowledge of the facts alleged, is legally irrelevant, or appears internally inconsistent. *Id.* at 498. In other words, a court may exclude testimony that "states only conclusions and not facts that would be admissible as evidence." *Id.* at 497–98 (citing *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1059 n.5, 1061 (9th Cir. 2002) (holding that the district court properly disregarded the declaration that included facts beyond the declarant's

personal knowledge and failed to indicate how the declarant knew the facts to be true); *F.T.C. v. Publ'g Clearing House, Inc.,* 104 F.3d 1168, 1171 (9th Cir.1997) ("A conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact.")).

The parameters of this rule are especially important. Sabato has provided deposition testimony as the only proffered evidence of a material disputed fact. In ruling on summary judgment, a court must "focus[] on whether the nonmoving party has come forward with sufficiently 'specific' facts from which to draw reasonable inferences about other material facts that are necessary elements of the nonmoving party's claim." *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 632 n. 3 (9th Cir.1987).

The plaintiff in *Villiarimo* alleged that her employer fired her because of her sex. 281 F.3d at 1059. The district court granted summary judgment. *Id.* at 1061. The Ninth Circuit reasoned that the district court correctly granted summary judgment because "Villiarimo cites only her own self-serving and uncorroborated affidavit and deposition testimony in support of [her] assertion [that she was fired because of her sex], and provides no indication how she knows this to be true." *Id.* at 1059 n.5. The plaintiff's statement in *Villiarimo* lacked the plaintiff's own personal knowledge of the reasons for her termination and instead sought only to support her claim. *Id.*

5

The Ninth Circuit distinguished *Villiarimo* in *S.E.C. v. Phan*. 500 F.3d 895 (9th Cir. 2007). The district court in *Phan* granted summary judgment in favor of the government's claim that the defendant had committed securities fraud. *Id.* at 907. The district court disregarded the defendant's declarations as lacking corroboration and being self-serving. *Id.* at 909–10. The Ninth Circuit reversed. *Id.* at 913–14. The Ninth Circuit acknowledged that information based on private *first-person knowledge* often will lack corroboration. *Id.* at 910 (emphasis added). This lack of corroboration does not necessarily lead to defeat at the summary judgment stage. *Id.* The plaintiff in *Villiarimo* and the defendant in *Phan* both suffered from a lack of corroboration. 281 F.3d at 1059 n.5; 500 F.3d at 910. The plaintiff in *Villiarimo* also lacked personal knowledge for the basis of her declarations. 281 F.3d at 1059. The defendant in *Phan* successfully avoided summary judgment because the defendant cited facts in his declaration based on his personal knowledge. 500 F.3d at 910.

*Villiarimo* and *Phan* prove instructive in applying this rule to Sabato's claims. The plaintiff in *Villiarimo* worked as a ramp supervisor for Aloha Island Air, Inc ("Aloha"). 281 F.3d at 1058. The plaintiff was working when an accident severely damaged an Aloha airplane during its departure from the gate. *Id.* Aloha investigated the accident. *Id.* at 1058–59. Aloha believed that the plaintiff had lied during the investigation. *Id.* Aloha terminated the plaintiff. *Id.* The plaintiff alleged

6

that the real reason for her termination was that she was a woman and that she previously had filed a pay complaint against Aloha. *Id.* at 1059.

The plaintiff relied on her affidavit and deposition testimony to defeat Aloha's motion for summary judgment. *Id.* The plaintiff contended that her firing was discriminatory for four reasons. *Id.* The plaintiff stated that the Hawaii Department of Labor and Industrial Relations noted she was fired for "reasons other than misconduct connected to her work" while reviewing the plaintiff's appeal for unemployment benefits. *Id.* The plaintiff also argued that evidence indicated that Aloha had replaced her with a man. *Id.* The plaintiff proffered this evidence through the deposition testimony of Aloha's Director of Airport Services. *Id.* at n.4. Aloha's Director of Airport Services speculated that the plaintiff may have been replaced by one of two male employees, but they were unsure. *Id.* The plaintiff also offered statistics that over five years only three of Aloha's thirty-three ramp agents had been women, and that the plaintiff was the only female ramp supervisor between 1995 and her termination in 1998. *Id.* at 1059. The plaintiff contended finally that the male ramp agents working at the time of the accident had been punished less severely. *Id.*

The facts of *Phan* are more complex than *Villiarimo*, but a general overview follows. *See Phan*, 500 F.3d at 898–902. The defendant in *Phan* was the chairman, CEO, and president of the Hartcourt Companies Inc. ("Hartcourt"). *Id.* at 898.

7

Federal securities law required Hartcourt to file an S–8 form when it issued a new security. *Id.* at 899–902. The S–8 form also directed Hartcourt to amend the form if any fundamental change to the security occurred. *Id.* Hartcourt issued one million shares of new stock to be used for employee compensation and registered them on an S–8 form. *Id.* The defendant subsequently used the stock to raise capital instead of the reported employee compensation. *Id.* The defendant failed to file an amendment to the S–8 form in potential violation of the securities laws. *Id.*

A dispute on appeal involved "the district court's holding that the evidence viewed in the light most favorable to [the defendant] demonstrated the materiality of [the defendant's] misstatements." *Id.* at 908. The Ninth Circuit acknowledged that determining the "materiality in securities fraud cases should ordinarily be left to the trier of fact" except when the misstatements are "so obviously important to an investor, that reasonable minds cannot differ on the question of materiality." *Id.* (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976) (internal quotations and citations omitted). Summary judgment in this instance proved improper where the determination of materiality required the trier of fact to determine the inferences a "reasonable shareholder would draw from" the alleged misstatements. *Id.* (internal quotations and citations omitted). The evidence in the record conflicted about whether the defendant had made a material misstatement to establish a securities violation. *Id.* at 909.

8

The defendant and the employee to whom the stock had been issued initially both provided declarations to the district court. *Id.* at 904–05, 09–10. The substance of those declarations involved how the stock had been issued, purchased, and used. *Id.* The declarations raised several conflicts of fact involving those same issues. *Id.* at 909. These declarations lacked corroboration and were self-serving as they involved conversations between the defendant and the employee. *Id.* at 910. The Ninth Circuit noted, however, that the defendant's and the employee's declarations described their own personal actions, and these actions were central to the alleged securities violations. *Id.* The Ninth Circuit also determined that the district court improperly had excluded the declarations based on perceived conflicts between the defendant's deposition testimony and the declarations. *Id.* The Ninth Circuit concluded that the defendant's testimony was "cursory" to "entirely consistent" with the declarations. *Id.*

The Court faces the question of whether Sabato has proffered sufficient evidence to raise a material question of fact to preclude the application of Mont. Code Ann § 85-7-2212 to Sabato's claims. The foundation of this question has two distinct parts: whether Sabato provided evidence to establish that something other than natural weather events caused damage to their property to avoid application of Mont. Code Ann. § 85-7-2212(1). In the alternative, whether GID's twice yearly diversions of water breach the banks of the WCFC and flood the Sabato property.

9

These alleged flooding events would preclude application of Mont. Code Ann. § 85-7-2212(2). In other words, has Sabato offered sufficient evidence that a "catastrophic, cataclysmic deluge" of water occurs when GID releases water into the WCFC, and does "the WCFC breach[] its banks in the lower reaches, where the Sabato property is located." (Doc. 218–1 at 48; Doc. 191–3 at 5.)

Personal knowledge represents the critical factor when evaluating uncorroborated and self-serving testimony. *Villiarimo*, 281 F.3d at 1059–64; *Phan* 500 F.3d at 907–10; *see also Gaudreau v. Clinton Irrigation Dist.*, 30 P.3d 1070, 1075 (Mont. 2001) (noting that the plaintiffs in a claim against irrigation district based on flooding of the plaintiffs' property had failed to "point to any testimony by a witness who observed debris in the Main Channel at any time."). Sabato provides the following evidence to defeat summary judgment: excerpts from Dr. Sabato's and GID manager Erling Juel's depositions and a Montana state district court decision applying Mont. Code Ann. § 85-7-2212. (Doc. 218–1; Doc. 218–2; Doc. 218–3.)

The deposition testimony from Dr. Sabato, like the testimony in *Villiarimo*, provides uncorroborated and self-serving conclusions that lack any basis in personal knowledge. (*See* Doc. 167–1; Doc. 218–1.) Sabato seeks to defeat summary judgment with speculative opinion based on second-hand accounts. (Doc. 218–1 at 67–68, 76, 110–12.) Dr. Sabato has not personally observed conditions on

10

the property during the alleged injury. (Doc. 218–1 at 67–68, 74–75, 87, 176, 185, 188.)  Like the plaintiff's statement in *Villiarimo* that Aloha fired her for a discriminatory reason, Dr. Sabato offers only conclusory statements that flood damage exists on the property.  281 F.3d at 1058; (Doc. 218–1 at 67–68, 74–75, 87, 176, 185, 188.)  And like the plaintiff's allegation in *Villiarimo* that Aloha treated male employees differently after the gate accident, Dr. Sabato's testimony lacks personal knowledge of whether flooding occurs. Dr. Sabato's testimony regarding the conditions on the property during the alleged flood arises instead from second-hand sources.  281 F.3d at 1058; (Doc. 218–1 at 67–68, 76, 110–12.)

The closest Sabato comes to offering testimony based on personal knowledge relates to the "aftermath of flooding" on the Sabato property. (Doc. 218-1 at 14.) Similar to the conclusory statements offered by the plaintiff in *Villiarimo*, Dr. Sabato's testimony merely speculates about the origin of the conditions on the property after a flood. 281 F.3d at 1058. Dr. Sabato testified that "it just looks like everything is kind of like wiped and buried, and it looks like something flooded . . . [a]nd deposition has occurred, and I don't see any other explanation for it . . . maybe there is no explanation." (*Id.*) Dr. Sabato's testimony is speculative and self-serving based on his personal observations of the condition of the property *after* any alleged flooding has receded. (Doc. 167, ¶ 17; Doc. 218, ¶

11

17.) Dr. Sabato has never witnessed the alleged flooding that he speculates has caused the damage to his property. (*Id.*)

Sabato's claims are not subject to a strict standard required by the Securities Act of 1933. *Phan*, 500 F.3d at 908–09. The defendant in *Phan* faced a civil suit for an alleged violation of securities laws. 500 F.3d at 907–11. The defendant's actions were central to the claim. *Id.* The evidence that Sabato offers does not involve Dr. Sabato's own personal actions that would prove central to the claim as they were in *Phan*. Sabato alleges that the action of the irrigation districts, which neither he nor Plaintiffs' expert David Erickson personally have observed, causes Sabato's injury. (Doc. 167, ¶¶ 17, 19; Doc. 218 ¶¶ 17, 19.) Sabato fails to offer personal observations that create a genuine issue of material fact from which the Court can draw "reasonable inferences about other material facts that are necessary elements of the nonmoving party's claim." *T.W. Elec. Serv., Inc.*, 809 F.2d at 632 n. 3.

### B. Mont. Code Ann. § 85-7-2212(1)

Sabato argues § 85-7-2212(1) does not apply to their claims because the operation of the WCFC caused the damage that Sabato experienced and did not result from flooding caused by rain or other weather events. (Doc. 214 at 5–7.) Plaintiffs support this argument by relying on testimony from Dr. Sabato and Plaintiffs' expert David J. Erickson. (*Id.* at 6.) Dr. Sabato testified in his deposition that there is "a

systemic problem with how [the WCFC] is being run." (*Id.*) Mr. Erickson stated that "[a]s a result of the Irrigation Districts' operation and maintenance of the WCFC, erosion and deposition has caused the conveyed water to laterally migrate on the Plaintiffs' properties." (Doc. 191–3 at 5.)

Despite these claims, Dr. Sabato testified that the potholes on the Sabato property do not "have an actual veneer of water on there until it rains." (Doc. 218–1 at 134–35.) Mr. Erickson's testimony that erosion occurs in the WCFC "in the spring due to snowmelt and thaw that results in saturation of the high eroded banks and subsequent sloughing (mass wasting) of these banks into the WCFC channel" proves more troubling to Plaintiffs' argument. (Doc. 191–3 at 9.) GID manager Erling Juel also testified that natural runoff, snow melt, flood events, and rain contribute to the flows in the WCFC in addition to the water diverted from Gibson Reservoir into the WCFC. (Doc. 167–4 at 40–42.) Sabato does not dispute Mr. Juel's testimony regarding natural weather events impacting the flows of the WCFC. (Doc. 218, ¶ 24.)

The Court finds Doc. 167 Exhibit D particularly informative in resolving this issue. (Doc. 170.) The portion of the WCFC running through the Sabato property appears visible from roughly the 4:30 minute mark to the 6:30 minute mark. The video shows water flowing in the WCFC. The WCFC moves along a clearly defined channel running across the Sabato property. It is unclear whether the video depicts

the WCFC during a release of water from Gibson Reservoir. The video shows some potholes on the Sabato property full of water. If the video depicts a release, it shows no "catastrophic, cataclysmic deluge" of water and nowhere does "the WCFC breach[] its banks in the lower reaches, where the Sabato property is located." (Doc. 218–1 at 48; Doc. 191–3 at 5.) The water in the potholes on the Sabato property, as shown in the video, appears to accumulate through natural weather events or seepage from the WCFC. (*See* Doc. 170.)

If the video does not depict the WCFC during a release of water from Gibson Reservoir, the water shown in the potholes on the Sabato property must be of natural occurrence or seepage from the standing water in the WCFC. Even assuming the water on Sabato's property does not occur from flooding due to natural weather events, Mont. Code Ann. § 85-7-2212(2) bars Sabato's claims as being caused by water seepage that existed or began before Sabato obtained an interest in the property.

Sabato cites multiple parts of Dr. Sabato's deposition to support denial of summary judgment. (*See* Doc. 218, ¶¶ 18, 22–23.) Dr. Sabato's proffered testimony offers no facts. Dr. Sabato instead testifies to his opinions and conclusions that lack any basis in personal knowledge. (*See* Doc. 218–1 at 67–68, 74–75, 87, 176, 185, 188.) Dr. Sabato repeatedly concedes that he has never personally observed the WCFC during a release and that natural runoff contributes to the flows in the WCFC.

14

(*Id.*) Dr. Sabato fails to articulate how the alleged flooding event damages his property as he has not seen the alleged flooding. Dr. Sabato also cannot articulate any specific damage that has occurred from the alleged flooding. (*Id.* at 160; Doc. 167–1 at 56–57.) What Dr. Sabato describes in his deposition likely derives from a well-known natural event that occurs throughout the intermountain West every year—runoff. Dr. Sabato largely admits this source. (Doc. 218–1 at 88–89, 136, 159–60.)

Dr. Sabato's testimony proves analogous to the plaintiff's testimony in *Villiarimo*. Dr. Sabato's testimony regarding the cause of the changes to his property lacks any basis in his personal knowledge, like the plaintiff in *Villiarimo*, Dr. Sabato has never seen his property when the WCFC is running. (Doc. 218–1 at 67–68, 74–75, 87, 176, 185, 188.)  Dr. Sabato instead offers only self-serving and speculative testimony to support his position. (*Id.*)

### C. Mont. Code Ann. § 85-7-2212(2)

Sabato argues that § 85-7-2212(2) does not apply because a distinction exists between "seepage" and "flooding." Section 85-7-2212(2) limits recovery for damage "caused by water seepage." Sabato argues that their property experiences flooding— a surface problem—and not seepage—a subsurface problem—so § 85-7-2212(2) does not apply. (Doc. 214 at 7–13.) The Montana Supreme Court has discussed

Mont. Code Ann. § 85-7-2212(2) in two cases that help the Court in resolving this issue.

In *Wells v. Young*, the defendants purchased thirteen acres of property in 1988. 47 P.3d 809, 809 (Mont. 2002). The defendants periodically irrigated the property. *Id.* at 809–10. The plaintiffs purchased property adjacent to the defendants and constructed a home in 1992. *Id.* at 810. The defendants flood irrigated their property three times over four years between 1994 and 1998, as they had done before the plaintiffs purchased the property. *Id.* The crawl space of the plaintiffs' house flooded during each irrigation event. *Id.* The plaintiffs sued for trespass, nuisance, negligence, and requested an injunction. *Id.*

The Montana state district court "found that the saturation of the soils around the Wells' residence and the entry of water into the Wells' crawl space occurred due to flood irrigation practices used in irrigating the Youngs' field in 1994 and 1998." *Id.* (internal quotations omitted). The state district court concluded that the irrigation practices predated the plaintiffs' purchase of the property, and, therefore, Mont. Code Ann. § 85-7-2212(2) prevented the plaintiffs from recovering damages. *Id.* Despite reaching this conclusion, the state district court granted an injunction that prevented the defendants from irrigating. *Id.* The Montana Supreme Court reversed the district court's injunction and implicitly recognized that § 85-7-2212(2) barred the plaintiff's claims. *Id.* at 814.

The plaintiffs in *Alexander v. McCauley* alleged that the defendants had negligently caused excessive water to flow through the defendants' irrigation ditch and that this excessive water flow had caused flooding of the plaintiffs' property. 819 P.2d 176, 177 (Mont. 1991). The defendants acquired their ditch rights in 1988, but the ditch had been in operation since 1888. *Id.* at 176. During the spring and summer of 1988, the area of Montana where the ditch was located received significant rainfall. *Id.* at 177. The defendants placed straw bales at the point of diversion on the Boulder River to increase flow into the irrigation ditch. *Id.* The increased flow resulted in seepage and the plaintiffs' houses flooded. *Id.* The defendants stopped the water flow to the ditch in late June. *Id.* Plaintiffs then saw a decrease in water levels in their homes. *Id.*

The Montana state district court granted summary judgment for the defendants based upon the application of Mont. Code Ann. § 85-7-2212. *Id.* The Montana Supreme Court affirmed. *Id.* The Montana Supreme Court reasoned that even though "[h]omeowners assert that there was no seepage before the current ditch owners overused the ditch . . . none of the homeowners acquired an interest in their land prior to 1970." *Id.* Historical records showed that homes in that area had suffered similar issues since 1935, and the ditch had been in operation before that time. *Id.* The Montana Supreme Court concluded that "even if the damage to plaintiffs' basements was contributed to by defendants' ditch . . . it was either because

17

of weather conditions or the same kind of seepage that had existed for at least 53 years before the plaintiffs arrived or obtained an interest in the land." *Id.* Mont. Code Ann. § 85-7-2212(2) thus precluded the plaintiffs' claims. *Id.*; *see also Schaubel v. Iversen*, 848 P.2d 489 (Mont. 1993) (affirming directed verdict, in part, based on application of Mont. Code. Ann. § 85-7-2212)

Sabato's claims appear to be the sort that Mont. Code Ann. § 85-7-2212 intends to exclude. In *Wells* and *Alexander*, like here, the defendant irrigation ditch operators had been operating before the plaintiffs had purchased their properties. 47 P.3d at 810; 819 P.2d at 177. It remains undisputed that GID began running water through the WCFC in 1942. (Doc. 167, ¶ 7; Doc. 218, ¶ 7.) Sabato purchased the property in 2002. (Doc. 167, ¶ 5; Doc. 218, ¶ 5.) Sabato attempts to distinguish between seepage and flooding by arguing that a flood problem occurs when an irrigator ditch floods a field and waters seeps into the ground. Sabato argues that Mont. Code Ann. § 85-7-2212(2) does not apply to this type of flooding problem and instead covers only a seepage event. (Doc. 214 at 7.) The Court disagrees.

Sabato's claims present the same scenario as in *Wells*. The plaintiffs in *Wells* suffered from surface flooding and subsurface seepage. 47 P.3d at 810. Flood irrigation—the surface flooding event—led to flooding of the plaintiffs' basement— a subsurface seepage event. The plaintiffs in *Alexander* suffered similar surface and subsurface events. 819 P.2d at 176–77. The defendant ditch owner increased water

18

flow into the irrigation ditch that resulted in water seepage that flooded the plaintiffs' homes. *Id.* Mont. Code Ann. § 85-7-2212(2) precluded the plaintiffs' claims in both *Wells* and *Alexander*.

*Wells* and *Alexander* prove directly analogous to the present facts. GID diverts water from Gibson Reservoir into the WCFC twice per year. During this diversion, GID's operation causes seepage throughout the WCFC, including the natural portion that runs through the Sabato property. (Doc. 167, ¶ 8; Doc. 167–4 at 42.) The Sabato property experiences seepage from the WCFC when GID diverts water. (*Id.*) This seepage from the WCFC increases groundwater saturation and causes the gumbo pits on the Sabato property. (Doc. 167–1 at 134; Doc. 167–4 at 42; *see also* Doc. 167–2.)

Sabato offers no facts to support their claims. It remains undisputed that Dr. Sabato and Mr. Erickson have not observed the WCFC in person during the spring or fall when GID diverts water through the WCFC. (Doc. 167, ¶¶ 17–19; Doc. 218 ¶¶ 17–19.) (Doc. 230 at 6.); *Gaudreau*, 30 P.3d at 1075 (disregarding expert witness's testimony that a "debris jam" in canal caused flooding that damaged the plaintiffs' property based on fact that the expert "neither personally observed any debris in the Canal nor spoke to anyone who did.") If neither Dr. Sabato nor Mr. Erickson have observed the WCFC during one of the biannual releases, the Court

views with skepticism their theory that the operation of the WCFC results in a full flood of the Sabato's property.

Doc. 167 Exhibit D again proves helpful. (Doc. 170.)  Under Sabato's theory, when GID releases water into the WCFC, it does so at such a quantity that the water exceeds the capacity of the WCFC and overflows the canal's banks. The video depicting the portion of the WCFC running through the Sabato property shows a distinct and channelized corridor. The banks of the WCFC rise a few feet above the water. It would require a huge amount of water for the WCFC to overflow its banks and flood the Sabato property. It seems illogical that GID would operate the WCFC in this manner as it would result in an incredible waste of water. It seems reasonable that Sabato would be able to document an amount of water that would result in the type of significant damage that Sabato claims.

Sabato has offered no substantive proof of such an event happening other than their opinions and speculative claims based on second-hand accounts. (Doc. 218, ¶ 18; Doc. 218–1 at 67–68, 76, 110–12.) Sabato references an account that Dr. Sabato heard from a third party regarding the WCFC flowing across the Sabato property in 2010 at a width of 300 feet. (Doc. 218-1 at 68, 75–76.) Dr. Sabato acknowledged that 2010 had been an unseasonably wet year. Dr. Sabato remembers officials being worried about the Fort Peck Dam in eastern Montana giving out because the Fort Peck Reservoir was above capacity in 2010. (*Id.*) Dr. Sabato also admitted that he

has not observed the condition of his property worsen over time. (218–1 at 160; Doc. 167–1 at 56–57.)

Dr. Sabato's testimony further conflicts with Sabato's theory. Dr. Sabato described the wet conditions of his property as "leak[ing] in from the side and kind of keep[ing] things wet. So I think when this floods out, it goes into the subsurface." (Doc. 167–1 at 134.) Defendants also offer testimony of GID manager Earling Juel that the WCFC loses water to seepage. (Doc. 167. ¶ 24.) Sabato counters Defendants' claim by arguing that Juel's testimony was about the upper constructed portion of the WCFC. (Doc. 218, ¶ 24.) This interpretation is incorrect. Mr. Juel testified about both the upper constructed section and lower earthen section of the WCFC. (*See* Doc. 167–4; Doc. 218–2.) Mr. Juel stated "[w]hat happens downstream [] with the earthen channel, the dynamics, all of that stuff, that's where changes can occur. Initially there's a lot of seepage. And as that soaks up, then the water that you're releasing is more likely to pass all the way -- you know, less seepage occurs." (Doc. 167–4 at 42.)

Dr. Sabato's and Mr. Juel's testimony describe seepage for which Mont. Code Ann. § 85-7-2212(2) precludes recovery. Sabato's proffered testimony offers speculative self-serving opinions and does not provide sufficient specific facts from which the Court can draw reasonable inferences to raise an issue of material fact. Sabato's evidence does not avoid summary judgment.

21

## CONCLUSION

The Court will grant GID's motion for partial summary judgment regarding Plaintiff Sabato's claims. The undisputed material facts show that the alleged damage to the Sabato's property is caused by a combination of natural weather events and seepage from the operation of the WCFC. The WCFC began operations roughly six decades before Sabato purchased the property. Sabato has offered no evidence to the contrary other than speculative opinions not based on personal knowledge. Mont. Code Ann. § 85-7-2212 precludes Plaintiff Sabato's claims.

## ORDER

Accordingly, **IT IS ORDERED** that:

1.  GID's Motion for Partial Summary Judgment Regarding Plaintiff Sabato's Claims (Doc. 166) is **GRANTED**.

DATED this 1st day of November, 2024.

Brian Morris, Chief District Judge
United States District Court

22